I am a late substitute for my partner Adam Davis, who wrote our briefs and who had hoped to be here but suddenly and regrettably could not, and whose parting words to be yesterday were the very reassuring, just don't screw it up. So with that in mind, here I am and here we are. The Cervenys are back. And our district court has still not allowed us fact discovery beyond the limited scope of defendant's conflict preemption defense, which was the and this court's May of 2017 opinion at 855 F 3rd 1091. The district court's latest memorandum decision and order November 29, 2017 is erroneous and it should be reversed. And the case remanded to move forward with a complete discovery with complete discovery and a jury trial. Because the Cerveny's three remaining claims for failure to warn, fraud, and negligent misrepresentation are based on and supported by Utah law and by the facts in the record submitted in the Cerveny's on the contested elements, even without the benefit yet of full discovery. So one reason possibly for the district court's erroneous granting of summary judgment the second time is that the court neither acknowledged nor applied, we believe, its responsibility to view the evidence and the reasonable inferences to be drawn there from in the light most favorable to the Cerveny's as the non-moving party. So my plan is to address each of the Cerveny's claims and explain briefly why they should not have been granted summary judgment against them. And I know the panel is familiar with the facts, but let me briefly summarize here just to put the claims into context. In September and October of 1992, Victoria Cerveny took Clomid, a fertility drug, hoping it would help her ovulate and conceive a child. Did it, in fact? Is that in the record? I know that she must have become pregnant in late October, and it just says that she used it, was administered Clomid in October. Is that what led to the ovulation? Do we know that? Well, I guess we don't know if Clomid actually led to ovulation. We do know she took Clomid in October of 1992, and she thereafter became pregnant. And that is in the record in her continued to take Clomid after the point in time that she became actually pregnant. And so that therein leads to some confusion that I think brings us here today. Well, it seems to me in reading this that that's not even an issue, the fact that she never took the drug while she was pregnant. That seems to be reaming throughout the cases and everything, and the briefs. That's an undisputed fact, yes, Your Honor. No, I'm saying that it can't be, because I think even in the first opinion, it says that she acknowledges that she never took this medication while she was pregnant. Correct. And it serves no purpose when she's pregnant. The purpose of Clomid is to facilitate ovulation to help someone become pregnant. That is its only purpose. Clomid is not taken by a pregnant woman to help her become more pregnant, for example. You know, it doesn't have a use in a pregnant woman. And so that's correct. She took it prior to becoming pregnant, and that is the usual way in which the drug is taken. She testified that she had no knowledge and was not warned that taking Clomid to assist in becoming pregnant, which is the indicated and approved use of Clomid, could present a risk to the baby if conceived. And had she known that in September of 1992, that using Clomid could present a risk to the baby she hoped to conceive, she would not have used Clomid and would have continued to try to conceive a child naturally, which there was no genetic family history of birth defects. Alexander, who was born after Clomid, had a child naturally without the use of Clomid later, and that child had no birth defects. So we contend that Ms. Cervini's use of Clomid, in fact, caused the birth defects from which Alexander suffers. And all three claims here center on the adequacy and the accuracy of the warnings provided by defendants, Clomid's manufacturer, about the drugs. There's two aspects of causation, typically, whether there's but-for causation and proximate causation. And I think Aventis, I don't know that they've quarreled much with the actual causation prong. What they have focused strenuously is on proximate cause. And let me ask you about a legal component of that inquiry, and that is, does proximate cause under state law require foreseeability of the mechanism that causes the injury? In other words, in your partner's briefing, he's extensively argued that with regard to that she didn't know that the manner of the injury that would be caused by taking Clomid prior to pregnancy. But under state law, for proximate causation, the question is whether or not it's reasonably foreseeable that the mechanism would cause the injury, correct? I don't necessarily agree with that characterization of what the focus is of the foreseeability injury and proximate cause. But isn't that exactly what the case that you cited, Dease, doesn't that Dease specifically say that, that the appropriate inquiry focuses on the specifics of the alleged tortious conduct, such as whether the specific mechanism of the harm could be foreseen? Right. And let me try to put that into context then. What is not necessary is that the exact or precise mechanism or sequence between the defendant's wrong and the injury suffered be known or predicted precisely in advance. What is necessary is that there be an unbroken chain of foreseeable events that lead from the act to the injury suffered. And the best way to look at it is comparing, for example, the Jacobs-Peterson, excuse me, yeah, I believe the Jacobs-Peterson case and the Bandesign case that are both cited and discussed in the briefs. Because one, there's a, one is the National Guard machine gun training in extreme fire conditions. The U.S. agreed it was negligent, starts a fire, fire gets out of control, mandatory evacuations, and a woman who was loading her horse into a trailer is injured by the horse while she is hurrying to evacuate because of the fire. Now, my point, the mechanism, did someone know exactly how she was going to be injured by her horse loading into a horse trailer? Should they have foreseen that when they were deciding negligently to do gun testing on an extreme fire danger day? Maybe not. But the mechanism or the sequence was foreseeable each way. It's foreseeable that you do firearms training on an extreme fire danger day, that causes a fire, the fire gets out of control, that leads to evacuations. And the court said each of those steps is foreseeable from the original act as opposed to the Bandesign case, which is passenger in the car is shot by another driver of a different vehicle, shot and killed. The defendant was the driver of the car in which the victim passenger was riding and the defendant was driving recklessly. It is foreseeable that driving recklessly might cause death of a passenger. That's not the issue. But the issue is it's not foreseeable that that death might result from an act by a criminal act by a third party. Right. And you make that argument extremely well. But let me ask you this follow-up question. Sure. How can we reasonably ascertain that a fact finder could reasonably infer that in 1987 when the FDA told Aventis you recommended this warning for taking Clomid during pregnancy that Aventis should have reasonably foreseen that if someone takes Clomid prior to pregnancy that they might very well experience the same injury, the same potential for birth defects that would have otherwise transpired by taking Clomid after pregnancy? Well, I have two answers. I mean, I think it's in the proposed, I think you can infer it from the proposed language of the warning that the FDA wanted Aventis to have. But it was a class 10 warning, right? I mean, by definition the warning would have, well, actually that was before those designations. But even in 1987 the whole purpose of that recommended warning was about taking Clomid during pregnancy. I disagree. I think the language of the warning says otherwise. The language of that proposed warning in 1987 is very critical. It was pregnancy category X, that was what they wanted to declare, which is risk to the fetus of a drug taken during pregnancy. So let's categorize it that. But then this was the warning that they wanted Aventis to say. Since there is a reasonable likelihood of the patient becoming pregnant while receiving Clomid, the patient should be apprised of the potential hazard to the fetus. I don't understand how that helps you. Because it's putting a spotlight on be very careful you don't take Clomid while you're pregnant. It doesn't say anything about any danger of pregnancy. I'm not even sure it is a danger. Again, there is no use and no one is arguing otherwise here. There is no use of Clomid once you are pregnant. There's only one class of Clomid users. I think the failure of the district court here is to get hung up on thinking there's two classes of Clomid users and this warning only applies to the class of Clomid users who take it while they're pregnant. That's not a class of Clomid users. The only class of Clomid users, it is to assist a woman in ovulating to become pregnant. It is only used by women who are not pregnant to become pregnant. The danger is, the danger is there's no light bulb that goes on the moment a woman becomes pregnant. You're not positive of when that moment occurs. And if you continue to do that, it can cause harm to the fetus and we contend it can cause harm to the fetus and we have evidence and we will have evidence. It can cause harm to the fetus if taken before pregnancy but remaining in the body in sufficient quantities to affect the fetus. And had this warning been given that the FDA said you should give, it is a warning by its terms. It is a warning directed to women who are not pregnant that just, since there's a reasonable likelihood of the patient, it's only talking about one patient, becoming pregnant while receiving Clomid, the patient, same patient who is not yet pregnant, should be apprised of the potential risk to the fetus, potential hazard to the fetus. The point being there's one class of patients and Mrs. Servini was in it. And she says if I had been told that a drug I might put in my body attempting to become pregnant might cause harm to my fetus, to my baby, I simply wouldn't, I would have chosen not to take the drug. Other women might choose differently. Other women might choose to accept that risk because they really believe they need Clomid to become pregnant. That's a choice that women should be free to make but they should be free to make it based on adequate warnings. They should get the full information and Aventis resisted that. The FDA said give women the information about potential hazard to the fetus. And Aventis said no, we don't want to say that. And so instead their warning that we say was inadequate was no causative evidence of a deleterious effect of Clomid therapy on the human fetus. Ed, let me ask you this. In 1992 what evidence was there that that was untrue? Give me your best evidence. I read your brief. The best I can do is cite to the things we cited on page 39 of our brief in the appendix. Which one of those? And unfortunately this is the one weakness I will have here in this oral argument. To me your best evidence was that there had been a study that there were 58 birth defects of women taking Clomid therapy. And then when I go back to the summary judgment record, it was 58 out of 2,369 women who had taken Clomid therapy. And so when I took the calculator, because I'm not very good at math, that's 2.5% of the women. Now, you have no evidence in the summary judgment record, you certainly haven't presented us with any evidence of how much in a general population of women that don't take any ovulation-inducing medication is there for birth defects. In other words, if you take all of the women in the United States that become pregnant, of what percentage of those women have offspring with birth defects? We have no information. Is it more than 2.5%? Is it less than 2.5%? So that's not, I don't think, at least I wonder, how could that be causative evidence? And the other evidence was simply that in 1963 someone had expressed concerns. I just didn't see any evidence that in 1992 there was any causative evidence of a deleterious effect on the human fetus from taking Clomid therapy. Okay. I'm obviously out of time and I will respond simply by saying I think we believe we did submit evidence that proves the falsity of the statement. We also believe the FDA's proposed warning is also evidence that goes to the falsity of that statement. We think it just is so contrary to that statement that that is something a reasonable juror could infer makes that statement false. And so, but I otherwise point taken, I know what we have submitted and is in the record is in the record. And so I appreciate your time, your honors, and with that we do request that the court remand the case back. Thank you. And I do appreciate the fact that you're filling in. Thank you very much. William Northrup. Your Honor, my name is William Northrup. I'm with the Shokardi and Bacon firm and I'm here on behalf of the Appellee of Venice, Inc. There are a number of issues here today, but I think they really all boil down to one overarching question, which is may a plaintiff challenge the accuracy, sufficiency, and adequacy of the warning when it is undisputed that the plaintiff never encountered the risk that the warning addressed. Here it's undisputed that Mrs. Cervini did not take Clomid while she was pregnant with Alexander Cervini. The warning that plaintiffs advocate, the 1987 FDA pregnancy category X warning, is a warning about the risk of taking Clomid while pregnant. The warning that the plaintiff's challenge is inadequate, the 1992 FDA Clomid pregnancy contraindication, and we'll get to contraindications later, because I think the fact that it's a pregnancy contraindication is extremely important. It's not merely a warning, it's an absolute prohibition of the use of the medication during pregnancy because of the risk of birth defects. Counsel, did you argue this case the first time it was up here? No, Your Honor, I did not. As I started to say, probably two members of this counsel may know this case better than you do. They very well may, and I do want to lean on their knowledge as well. Well, that's what brings me to the point, because I wasn't. And your opposing counsel is saying this case was sent back to look at Utah law in regards to, I believe it was, warning, fraud, and misrepresentation. Now, as I understand, that's where opposing counsel was trying to get to in regards to that. Can you give me any Utah case that's similar to this that says where she never took, I mean, the issue is that she never took it, that that is sufficient for her to be able to claim a cause of action. Is there any Utah case as first as the warning? Okay. As the warning, there's no Utah case directly on point, and there are a number of cases throughout the country that deal with these issues, and we've cited a bunch of them in our brief. The Utah Supreme Court and Utah courts have not addressed this type of situation. I think there's a simple reason for it. Well, I'm agreeing with you. I don't need the simple reason for it. I wasn't able to find a case in like that. Now, as to fraud, is there a Utah case that you can cite to me that the district court in this case may have overlooked on behalf of this lady? You know, there's not a Utah case that I could cite to you on fraud that the court may have overlooked. Was there any case close to it that you could find? No, I have not found a Utah case close to on point. Let me move to the misrepresentation issue then. Is there any Utah case law that addresses as to the fact that this may have been a misrepresentation in regards to that? No, no. Again, I'm not aware of any case close to it, Your Honor. And I do think there's a reason for that, which is that when you have a situation where a warning addresses a particular risk, and there's been discussion about time and manner warnings, and time and manner warnings are actually fairly common, because warnings address risks. They don't address outcomes. And if you look at the House case, when the House case talks about the duty to warn, it talks about the presence of a risk that renders the product unreasonably dangerous. It doesn't talk about an outcome. It doesn't talk about an injury. It talks about a risk. And sometimes with a drug, a risk applies across the board, and you have a broad warning. And there are cases that address, you know, if a drug has a risk of cancer, and there's a warning about a risk of cancer, and whether that's adequate or not. But then there are other situations where a risk arises in a particular circumstance, where the risk only exists in a particular manner. And that's where the contraindication of Clomid comes in, is we're dealing with a situation where we have a manner of risk. And when we have a focused warning on a manner of risk, the adequacy of that warning, and whether that warning causes injury, can only be addressed in the question of whether that manner happened. And we had a couple of analogies that we used in the district court that I think are apt here. We didn't include them in our brief here, but if you buy a car seat today, every single child car seat has a very stern warning on it that says, do not install this car seat in the front seat of the car. Severe injury can happen if you install it in the front seat. Well, imagine a case where a person bought a car seat, installed it in the back seat of the car, had a car accident where the child was injured, and the plaintiff came in and said, you know what, if I had been given a stronger warning about the dangers of installing it in the front seat of the car, I would have looked and bought a safer car seat. That's very much what we have here. The warning is disconnected from the facts of the case. In the House case, which is the seminal case sort of on warnings in Utah, it involved a bulletproof vest. A police officer was involved in a siege of an armed compound. He was wearing a bulletproof vest. He was not warned that his bulletproof vest would not stop a rifle bullet. And he, unfortunately, was shot and killed by someone using a rifle. The bullet hit his vest and penetrated through it. The defendants in that case argued, we should not be liable because it's open and obvious that you can get shot and killed while wearing a bulletproof vest. You could get shot in the head, you could get shot in the leg. There are all sorts of places the vest doesn't cover. It's an open and obvious risk of being shot and dying. The court in the House case rejected that and said, no, here the bullet hit the vest. And, yes, it's true, had he been shot in the head, had he been shot in the leg, that would be a different case. But he was shot through his vest. So if you sort of flip House around, House was a situation where a defendant was trying to argue facts that didn't happen to argue that their warning was adequate. Here we have the opposite, where we have the plaintiff is trying to take a situation and apply it where the facts don't match the warning. We have a very specific warning against use during pregnancy. Mrs. Cervini didn't use the medication during pregnancy. She's trying to convert this warning to challenge the warning because it did not warn her of the risk of not taking it during pregnancy. Let me ask you there, because what we're brushing up against is why in the world did Aventis resist and decline the FDA's contraindication in 1987, which according to Mrs. Cervini's counsel, had that been given, we wouldn't even be here. And the only reason I can think that it would resist that is because of sales. Well, I think that the reason they resisted it, and there's correspondence that's in the record back and forth. I wish I could tell you exactly where it is in the record. But they went back and they said pregnancy category X is supposed to be for medications that not only are not used during pregnancy, but are not supposed to be used by women who are trying to get pregnant. We have a pregnancy drug that is, in fact, only indicated for use when a woman is trying to get pregnancy. So we don't think that the pregnancy category X designation is the right designation. The other thing they told the FDA... Well, wait a minute, let me stop you there, because that's an ambiguity that I could use some help from you as far as explaining. You just kind of used the language, or may become pregnant. And that could mean, if you're concerned about your fetus, don't use this even before you become pregnant. Or it could mean that the warning is for people who may become pregnant to know that once you are pregnant, don't take it, because the fetus could be damaged. And that's how I read it. You're reading it a different way. No, I'm reading it a different way, because the way I'm reading the warning, and first the FDA... Wouldn't that be the end of Clomid? If the warning were, don't use this while you're pregnant, and don't use this before you're pregnant? And I think that would be the end of... It makes no sense on a pregnancy medication, and if it were the end of Clomid, that would be a tragedy. And that's why you don't read it that way, though. Well, but Clomid is one of the longest-standing and most successful fertility medications on the market today. It's on the market today. It has a warning very similar to the warning that was on the label back in 1992. It's been on the market since, I believe, 1967. There are thousands of people who owe their existence today to Clomid. And I do want to address something that Judge Bacharach said earlier, which is whether or not we dispute that Clomid caused the birth defects here. It's not for the purpose of this brief, or this motion for summary judgment was filed early on an incomplete record. We absolutely do dispute that Clomid caused the birth defects. And I'm not sure that I'm fully getting to your point, but I think it makes sense to go back to the languages that the FDA proposed. And the language that the FDA proposed in 1987 is contained in the record on page 1, or excuse me, page 596 of the appendix. And I want to just read the whole warning, because I think the warning hasn't really been read in its full context. And I've noticed, and we commented on our brief, that there are points in the Cerveny's brief where they purport to quote this warning, but they leave out some very important language. The warning says, Pregnancy Category X, see contraindications and information for patients. Contraindications. Clomid is contraindicated in pregnant women. Clomid may cause fetal harm when administered to pregnant women. Since there is a reasonable likelihood of the patient becoming pregnant while receiving Clomid, the patient should be apprised of the potential hazard to the fetus. And then information for patients under this heading, appropriate statements should be included, which correspond with the statements under contraindications. So what the FDA proposed is very clearly a warning that Clomid may cause fetal harm when administered to pregnant women. And then it says since there's a likelihood that the patient may become pregnant while receiving Clomid, the patient should be apprised of the potential hazard to the fetus. What's the hazard to the fetus? That it may cause fetal harm when it's administered to pregnant women. Now let's compare that to what she had, which is the 1992 version. And there we see, although no causative evidence of a deleterious effect of Clomid therapy on the human fetus has been seen, that sounds not too scary, such evidence in regard to the rat and the rabbit have been presented. Therefore, and so at least I can see how a person would read that and say, oh, here we are living in this litigious society and they have to cover everything. And so they're telling us that no big deal, but rabbits and rats and if you drink a thousand Diet Cokes a day, that sort of thing, no problem. Whereas the earlier one really does zero in on the fetus. Well, I think you have to read the contraindication and you have to approach the contraindication as a doctor would who's prescribing this medication. And the first thing is contraindications. Contraindications are the very first type of warning that appears in the label. It is the strongest type of warning that appears in the label. And it is viewed by doctors and others as an absolute prohibition of use under the circumstances. And it says that although no causative evidence of a deleterious effect of clomid therapy on the human fetus has been seen, such evidence with respect to the rat and the rabbit has been presented. Therefore, clomid should not be administered during pregnancy. To avoid inadvertent clomid administration during early pregnancy, the basal body temperature should be recorded through all treatment cycles and the patient should be carefully observed to determine whether ovulation occurs. If the basal body temperature following clomid is bifastic and is not followed by men's cyst, the patient should be examined carefully for the presence of an ovarian cyst and should have a pregnancy test. The next course of therapy should be delayed until the correct diagnosis has been determined. So it may not be in the lay terms. When you approach it as a layman, I agree with you, fetal harm in a lay term does come out and hit you. But this is something that's being written for doctors and it very clearly tells a doctor, this can't be administered during pregnancy. You have to observe the patient carefully. You have to run these tests. You have to give a pregnancy test to make sure it's not administered during pregnancy. And again, I keep coming back to the regulation. We cited in our brief it's 21 CFR section 201.57 subsection C5, which discusses contraindications. And it says a contraindication describes any situation in which the drug should not be used because the risk of use clearly outweighs any possible therapeutic benefit. Those situations include the use of drugs in patients who because of their particular age, sex, concomitant therapy, disease state or other condition have a substantial risk of being harmed by the drug and for whom no potential benefit makes the risk acceptable. So just by including pregnancy in contraindications, they're communicating to doctors that the risks outweigh the benefits. You can't use it in this circumstance. And I do think that going back to cases, I think that if this court were to say a patient could challenge the adequacy of a contraindication with respect to the contraindicated use, I'm not aware of any court in the country that has ever said a contraindication could be an inadequate warning of what it is saying is contraindicated. So on your argument, let's say we totally agree with everything you just said. What element of a duty to warn claim would your argument trigger? I think it would trigger several. I mean, it would certainly trigger approximate cause. I think it would trigger duty. The Utah law on duty is that we have a duty to warn of the risk when the risk makes the use of the drug unreasonably dangerous. Well, as to Ms. Cervini's use, use to induce ovulation, even if you said there's a failure to warn, that would still not be a risk that would make the drug unreasonably dangerous to her. And then finally, I think adequacy. We have a contraindication. To challenge the adequacy of contraindication and say it's inadequate to warn when Utah law merely requires that a risk be stated clearly. It doesn't require a perfect warning. It doesn't require the strongest possible warning. And in fact, the warning here worked. Ms. Cervini did not take Clomid while she was pregnant. To hold the Clomid label inadequate because the contraindication wasn't sorry to her. Sorry, my fault. I think you've answered my question very well. I would ask that you affirm. Thank you. Okay, I cheated the fellow out of your rebuttal time, so I'm going to give you an extra minute. Well, thank you, Your Honor. I knew I used all my time and then a little, and I didn't reserve any. So I will only comment to say that this court, in its prior opinion, noted the material difference between the warning proposed by the FDA and the warning that was actually given in 1992. We believe that material difference that this court has already observed explains and reasonably allows someone to infer that Ms. Cervini's affidavit testimony is reasonable. And it may or may not be believed by a jury. That's up to a jury. But she is entitled to have reasonable inferences drawn in her favor. And she was in the class of users to whom an adequate warning was required. Is the contraindication something a patient sees? Not very experienced with that. You know, I think that can probably vary by circumstance, but I would agree with Mr. Northrup that the warnings out of which the contraindication is where it's written is usually directed at physicians, but the expectation is physicians convey the warnings to their patients that apply to the drugs. So I guess that's how I'd answer that. But we believe that there is adequate evidence to allow her claims to move forward. She is entitled to all evidence and reasonable inferences drawn in her favor. We don't think that's been done, and we would like to see the case go back. Thank you. Thank you, counsel, for both sides, for your excellent advocacy. This matter will be submitted and court is in recess until 8.30 tomorrow morning.